UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                        CASE NO.  3:11-cr-

JENNA CRAWLEY

FACTUAL BASIS[1]

In early December 2009, an individual moved from South Florida to Jacksonville, Florida to open an illegitimate pain clinic business known as Jacksonville Pain and Urgent Care ("Jacksonville Pain"), then located at 1395 Cassat Avenue, Suite 2, Jacksonville, Florida.  This individual (hereinafter referred to as "the owner") opened Jacksonville Pain for the purpose of hiring doctors to work in the pain clinic business to prescribe pain medications, namely high dosages of 30 milligram and 15 milligram oxycodone pills, to patients seeking them.  Oxycodone, the generic name for a highly addictive painkiller, the abuse of which leads to severe psychological or physical dependence, is a Schedule II controlled substance, which is sold generically under a variety of brand names, including Roxicodone, Oxycontin, Percocet and Endocet.

In late 2009, the owner opened Jacksonville Pain to gain a strategic advantage over some rival pain clinic owners in the South Florida area.  Jacksonville Pain was incorporated on or about October 15, 2009 and was opened in early December 2009.

---

[1] The factual basis is prepared by the United States and does not include all of the facts relevant to the defendant's and other individuals' involvement in the crime to which the defendant is pleading guilty and other illegal activities in which the defendant may have been involved.

Defendant's Initials _JC_

In March 2010, the owner of Jacksonville Pain was evicted from the business location of Jacksonville Pain due to the large volume of people, many of whom were from outside the state of Florida, who congregated in the parking lot of Jacksonville Pain and that of the surrounding businesses. Once Jacksonville Pain closed in early March 2010, the same ownership, staff and some of the same physicians relocated from Jacksonville Pain to a new clinic known as Duval Wellness Center, Inc. ("Duval Wellness"), located at 203-9A West 48th Street, Jacksonville, Florida 32208. However, none of the client/patient files from Jacksonville Pain were transferred to the new physical location of Duval Wellness, despite that a significant number of the Jacksonville Pain clients/patients simply began going to Duval Welness once it opened. In addition, in early 2010, the owner opened yet another pain clinic in Jacksonville, Florida known as First Coast Pain and Urgent Care ("First Coast Pain"), located at 5834 Normandy Boulevard, Jacksonville, Florida 32205.

The typical individuals who went to Jacksonville Pain, Duval Wellness and First Coast Pain (hereinafter collectively the "Jacksonville pain clinics") were from outside the state of Florida, including but not limited to the states of Ohio, Kentucky and Tennessee. In late 2009, the owner of Jacksonville Pain (and later Duval Wellness and First Coast Pain) understood that he could create this strategic advantage over certain pain clinics in South Florida by eliminating over 600 miles of round trip drive time from these individuals' trip to Florida and still take advantage of running his clinic within the state of Florida. The owner of Jacksonville Pain took steps to obtain patient lists from at least one rival South Florida pain clinic and then market directly to those individuals by informing them that they could save significant travel time by coming to Jacksonville

Defendant's Initials _____     2

Pain and still obtain the same levels of oxycodone they were accustomed to receiving from the pain clinics in South Florida.

The owner's (and those working at his direction) direct solicitation of these "clients/patients," in fact, caused these clients/patients to travel to Jacksonville, Florida, instead of South Florida, to see the doctors that worked at Jacksonville Pain, its successor pain clinic, Duval Wellness, and also First Coast Pain.

In late 2009, the owner solicited Jenna Crawley, who lived in South Florida, to join the owner in Jacksonville as a co-owner of Jacksonville Pain (and later Duval Wellness). Jenna Crawley had the primary job of overseeing the day to day operations of Jacksonville Pain and Duval Wellness. Crawley worked for a period of months at the Jacksonville pain clinics and derived significant income from them. Crawley, at the direction of the owner, participated in the hiring of certain physicians and handled the documentation to ensure that these physicians could start working at the Jacksonville pain clinics to distribute oxycodone and other medications from their DEA issued numbers, which allowed the physicians to order controlled substance pain medications from pharmaceutical distributors. Crawley knew that the vast majority of the clients/patients traveling from hundreds of miles away to see the physicians at Jacksonville Pain and Duval Wellness were not legitimately in need of painkillers and simply knew that traveling to the Jacksonville pain clinics (instead of the longer drive to South Florida) would result in their obtaining the same significant levels of oxycodone and other narcotic medications they were accustomed to receiving in South Florida.

Crawley knew that the purpose of the Jacksonville pain clinics was for the physicians to see as many patients as possible in a day and prescribe them significant

Defendant's Initials _JC_    3

amounts of controlled narcotic painkillers. Crawley understood that significant income was derived from the clients/patients paying cash for the dispensed controlled substances from the Jacksonville pain clinics.

On or about December 14, 2009, as a result of the owner obtaining certain patient information from a rival South Florida clinic, individuals with an ownership interest in the South Florida clinic traveled to Jacksonville, Florida to confront and threaten the owner and others associated with Jacksonville Pain. The threats involved the South Florida clinic owners obtaining certain profits from Jacksonville Pain because of the Jacksonville Pain owners' actions of "stealing" patients. Various threats were made during this confrontation. Ultimately, officers from the Jacksonville Sheriff's Office responded and state arrests were made.

Prior to and after this event, the out of state clients/patients continued to travel to Jacksonville Pain and its successor clinic, Duval Wellness, and later First Coast Pain to see the physicians working there in order to obtain prescriptions for significant amounts of the Schedule II controlled substance oxycodone (both in 30 milligram and 15 milligram dosages), as well as xanax and soma. Xanax is a potent and fast acting benzodiazepine drug that acts as a sedative and its effects are exacerbated when combined with fast release high dosage opiates, such as 30 mg and 15 mg oxycodone tablets. Soma is a barbituate drug (which is not a scheduled controlled substance) that, when used in conjunction with xanax, creates a markedly increased euphoria. When 30 mg oxycodone, 15 mg oxycodone, xanax and soma are used in conjunction, the combination enhances the effects of each drug and substantially increases the chance for an overdose. Physicians prescribing these medications at Jacksonville Pain, Duval

Defendant's Initials _____   4

Wellness and First Coast Pain prescribed these medications together without appropriate individual assessments of patients.

The overwhelming majority of the clients/patients who traveled to and visited Jacksonville Pain, Duval Wellness and First Coast Pain were uninsured and paid cash for each doctor's visit (between $250 and $300 per visit every thirty days), obtained and paid approximately $250 cash for a Magnetic Resonance Image ("MRI") (which Jacksonville Pain, Duval Wellness and First Coast Pain also charged a $50 cash referral fee for the clients/patients to obtain an MRI) and then paid for the prescriptions themselves (typically about $500 to $750 for the different dosages of oxycodone and xanax and/or soma). It was common for a client/patient to pay an aggregate amount in excess of $1,000 cash per visit. A significant majority of these individuals complained to the doctors of back pain.

The owner paid the prescribing physicians at Jacksonville Pain, Duval Wellness and First Coast Pain a specific negotiated dollar amount per patient. This ranged from $40 to about $60 per patient. Some physicians treated upwards of 80 to 90 patients per day. Other physicians treated approximately 30 to 50 patients per day.

Another individual from South Florida worked with the owner of the Jacksonville pain clinics and Crawley and parked a semi-trailer nearby some of the Jacksonville pain clinics, which contained a mobile MRI machine. Individuals managing and working at the Jacksonville pain clinics routinely referred the clients/patients to this individual for an MRI (which was done via one of the physician's prescriptions). The clients/patients paid the Jacksonville pain clinics in cash for the referral and then paid the owner of the MRI machine cash for the MRIs. While there was an MRI machine in this trailer and the

Defendant's Initials _____   5

clients/patients typically laid inside the machine for a period of 15 to 20 minutes to obtain some form of an MRI, there were instances when patients received no legitimate MRI and were merely provided a printout with their name on it and some impressions and findings concerning an MRI of an individual's back.

The owner of Jacksonville Pain, Duval Wellness and First Coast Pain hired approximately five (5) individuals at various times to run the day to day operations of Jacksonville Pain, Duval Wellness and First Coast Pain. These individuals, in essence, ran the pain clinics and ensured that often in excess of one-hundred patients per day at each clinic saw the prescribing physicians in as orderly fashion as possible. The typical wait times that the clients/patients endured were substantial. Oftentimes, the clients/patients began lining up for their appointment days the night prior and during the early morning hours on their appointment day. Surveillance officers, cameras and cooperating witnesses saw individuals congregating in the parking lots at night and in the early morning hours and sleeping in the parking lots overnight waiting for their appointments. Syringes and other items consistent with drug use were found in the parking lots. The managers running the day to day operations of the Jacksonville pain clinics saw these vast crowds when they arrived to work and hired security guards to contain them. Some of the Jacksonville pain clinic managers had ownership interests in the clinics. Each day at Jacksonville Pain, Duval Wellness and First Coast Pain, owners and managers and an hourly employee would collect the cash generated from the previous day and take the cash to various local banks for deposit. Witnesses will testify that, as to First Coast Pain, these daily cash deposits ranged from as little as

$10,000 to as much as $80,000 to $90,000 per day. The median deposit, according to cooperating individuals, was about $40,000 to $50,000 cash per day.

During the investigation, DEA and FBI agents and JSO officers used two confidential sources to make various consensual recordings of the owner and certain physicians working at the Jacksonville pain clinics. During numerous recordings, the owner referred to himself, among other things, as the "highest volume [oxycodone] dealer in Florida." On April 1, 2010, CS-1 made a consensual recording of the owner and other owners/managers at First Coast Pain, during which the owner and managers explained, in substance, that it would be two years by the time "they" [law enforcement] inspected the Jacksonville clinics. The owner stated that this would likely start down south and that the Jacksonville clinics were not even a "blip" on the radar. The owner and managers discussed opening nationally and stated that they were "shedding money." The owner explained that each patient gets at least "2 bottles" of medications and that the mark-up in the price of the medications was significant. The owner and managers also discussed a person (Krystopher Legg - who is discussed below) who brought about 25 people per week to the clinics to obtain the medications. They even discussed that these individuals came in a bus.

Numerous other consensual recordings were made by CS-1 and another confidential source (CS-2). CS-1 introduced CS-2 to the owner and certain physicians at Duval Wellness and First Coast Pain. CS-2 had certain meetings with these various individuals. During one recorded meeting in mid April 2010, one physician told CS-2, among other things, "[w]e kinda get the feel of the DEA.... They are really after these clinics now because there are so many damn pain clinics in Florida and we have so

Defendant's Initials _____      7

many patients coming here from Tennessee, Kentucky, Ohio and Georgia and they [DEA] don't like that." One physician told CS-2 that he saw 140 patients in one day and that in the last "two weeks, [the physician] banked $12,000 a week."

CS-2 also made recorded phone calls and held recorded meetings with the owner. During one of the consensually recorded phone calls in mid April, the owner told CS-2 that if CS-2 was hired, the owner would pay CS-2 $4,000 per month to have a professional association in CS-2's name, that CS-2 would see 50 to 60 patients per day and that CS-2 could expect to make about $2,500 to $3,000 per day. The owner also stated that he consulted with a former DEA agent "about how to conduct business."

Krystopher Legg is from the Columbus, Ohio area. Multiple witnesses would testify that Krystopher Legg and his associates organized large groups of individuals to travel from the Columbus, Ohio area to a particular pain clinic in the South Florida area (the previously referenced rival clinic to the owner of the Jacksonville pain clinics) to see the doctors at that clinic to obtain large prescriptions of oxycodone (30 milligram and 15 milligram dosages), xanax and, on occasion, soma. These individuals, who Legg and others recruited, went to a pain clinic in South Florida and saw physicians who prescribed them these significant prescriptions without obtaining any medical documentation concerning the clients/patients other than an MRI provided by the clients/patients, performed no or a minimal/cursory physical examination and did not verify any information the clients/patients provided as to their history of medical prescriptions for pain management, including that for oxycodone. Typically, no alternative methods of treatments were discussed and no referrals to specialist physicians were made.

Defendant's Initials _____                 8

It was during this process that Krystopher Legg met the individual who owned the MRI business, who subsequently traveled to Jacksonville, Florida to work with the owner of the Jacksonville pain clinics to make significant sums of money from the clients/patients who ceased traveling to South Florida and began stopping in Jacksonville, Florida to see the doctors at the Jacksonville pain clinics. Legg formed a relationship with the owner of the mobile MRI machine. In some instances, patients received an MRI printout with their name and date of birth on it with some findings with respect to what was purported to be an MRI of their back. The owner of the MRI machine gave "specials" to Legg and his associates, including that for every third or fourth person that Legg and his associates presented for an MRI, the next MRI was free.

When the owner of the Jacksonville pain clinics opened Jacksonville Pain, Legg and his associates stopped traveling from Columbus, Ohio to South Florida and instead stopped in Jacksonville, Florida. The owner of the MRI business expanded his business to Jacksonville, Florida to service those clients/patients traveling to the Jacksonville pain clinics instead. This relationship continued, in that Legg brought large groups of clients/patients to Jacksonville Pain, then Duval Wellness and also First Coast Pain to see the prescribing physicians. Legg's "sponsored" clients/patients were often moved ahead in line at the clinics on many occasions because Legg and others associated with him paid cash tips to the security guards and employees at the Jacksonville pain clinics. Legg paid for his sponsored clients/patients' MRI, doctor visit fees and the prescribed medications. Legg and others associated with Legg, who profited from this system, did this on a weekly basis for groups of people ranging in

Defendant's Initials _[signature]_        9

number from 10 up to 25. In addition to paying for these clients/patients' fees and costs associated with these visits, Legg paid them individually either between $500 and $1,000 in cash or approximately fifty (50) of the 30 mg oxycodone pills prescribed to them per visit.

Prior to seeing the physicians, Legg often provided the clients/patients with synthetic urine that he purchased and then mixed with oxycodone and provided that to his clients/patients in a container so that the client/patient could put the liquid in the urine specimen cup so that the client/patient would test positive for the presence of opiates. This was to ensure that there was some documentation in the client/patient chart that the patient tested positive for opiates. In addition, other clients/patients not associated with Legg would testify that they often snuck in condoms full of urine mixed with oxycodone only so that the client/patient would not have to provide his or her own urine specimen, which would have tested positive for marihuana, cocaine, methamphetamine and other drugs. On numerous occasions, the Jacksonville pain clinics had to call plumbing companies to come out and unclog the toilets and plumbing system because of the amounts of condoms flushed down the toilets. Even when these incidents occurred, the owners and managers of the clinics did nothing to curtail this activity of the clients/patients.

Legg's clients/patients (and numerous other clients/patients not associated with Legg) saw the various doctors at Jacksonville Pain, and later Duval Wellness and First Coast Pain, who performed cursory (if any) physical examinations, obtained no medical documentation other than the MRI the clients/patients provided and made no independent verification from prior physicians as to the levels of narcotic prescription

Defendant's Initials _____                    10

painkillers (if any) that these clients/patients claimed to be taking or using. In fact, Legg became personally acquainted with certain physicians who knew when they were seeing "Krys's people" and that these clients/patients were "VIPs" (very important patients). The physicians normally spent little time with the clients/patients during the initial consultation, and even less in the follow-up visits, which occurred around every 30 days for each client/patient. On many occasions, certain physicians did not even consult with patients appearing for a follow-up visit and had a member of the staff simply print out a new prescription for them. In the significant majority of cases, the physicians prescribed between 240 and 150 30 mg oxycodone tablets (in dosages of either 240, 210, 180 and 150 30mg pills), between 60 and 120 15 mg oxycodone tablets (in dosages of either 60, 90 or 120), between 30 and 90 2 mg xanax tablets (in dosages of 30, 60 and 90 2 mg pills) and, in some instances, varying amounts of soma, all of which were to be taken by the individual client/patient in a 30 day period. For example, if a client/patient obtained 240 30 mg oxycodone pills, 90 15 mg oxycodone pills and 60 2 mg xanax tablets, per the prescription, the client/patient was supposed to take 8 30 mg tablets per day, up to 3 15 mg tablets per day for "breakthrough" pain between taking dosages of 30 mg pills and up to 2 full xanax tablets per day in varying denominations. In oxycodone alone, this is up to 285 milligrams of oxycodone per day. The oxycodone, xanax and soma pills were oftentimes dispensed right out of an in house pharmacy/dispensary inside Jacksonville Pain, Duval Wellness and First Coast Pain. A witness anticipated to be qualified as an expert in internal medicine with a sub-specialty in pain management (who has previously been so qualified in federal courts throughout the United States) will testify, among other things, that such levels of

Defendant's Initials _____           11

oxycodone are potentially lethal. This individual, if qualified as an expert witness, would testify that the physicians working with Jacksonville Pain, Duval Wellness and First Coast Pain prescribed the Schedule II narcotic medications outside the usual course of medical practice and not for any legitimate medical purpose.

When Legg's clients/patients left the Jacksonville pain clinics, they traveled with Legg and others back to Columbus, Ohio. The clients/patients would meet Legg at various locations, including hotels and residences in Columbus, Ohio, and exchange their pills for the previously described payments. Legg and others then re-sold the oxycodone pills (both 30 mg and 15 mg pills) in the Columbus, Ohio area for significant profits. A single 30 mg oxycodone pill in Columbus, Ohio has a street value of between $20 and $30 per pill. In many instances, the street value is $1 per milligram of oxycodone.

On April 19, 2010, a group of Legg's clients/patients traveled from Columbus, Ohio to Jacksonville, Florida to see the physicians at Duval Wellness. Many of the clients/patients saw the various physicians at Duval Wellness on April 19; others saw the physicians at Duval Wellness on April 20. One such individual who saw a specific doctor on April 19 at Duval Wellness was Robert Lee Johnson. Witnesses will testify that Robert Lee Johnson (also known as "pork chop") was a client/patient sponsored by Krystopher Legg. Johnson had then recently been in jail in the Columbus, Ohio area for a period of weeks between his March 2010 and April 19, 2010 visit to Duval Wellness. The physician who treated Robert Lee Johnson issued him the following prescriptions: 240 30 mg oxycodone pills, 60 15 mg oxycodone pills, 60 2 mg xanax pills and 60 350 mg soma pills. Robert Lee Johnson's medical chart, which was seized

Defendant's Initials _____                                12

from Duval Wellness, contains no medical documentation other than an MRI Robert Lee Johnson provided. There is no record of previous medical history, minimal notes as to previous evaluations, no notes concerning alternative methods of treatment, no referral to a specialist and the evaluation performed on April 19, 2010 was minimal. While Robert Lee Johnson's MRI shows minor abnormalities in the lower back area, none of the abnormalities called for these levels of Schedule II narcotic painkillers. In addition, relatives of Robert Lee Johnson, including his mother and widow, would testify that Robert Lee Johnson did not suffer from back pain and had never been prescribed these types of painkillers, but had addiction problems with oxycodone and knew that he could cheaply obtain oxycodone (compared with simply buying oxycodone off the street in Columbus, Ohio) by traveling to Florida in this manner with Krystopher Legg and those associated with him.

That night, Legg and Legg's clients/patients from the Columbus, Ohio area stayed at a La Quinta Inn in Jacksonville, Florida. Many of the clients/patients, including Robert Lee Johnson, had their oxycodone and xanax pills in the bags provided to them by the in house dispensary inside Duval Wellness. That evening, Robert Lee Johnson consumed alcoholic beverages and took 30 mg oxycodone pills, including some of those prescribed to him on April 19. Late that evening and early in the morning hours of April 20, 2010, Robert Lee Johnson began to show signs of an oxycodone overdose. Legg and individuals associated with Legg told other individuals traveling with them to put Robert Lee Johnson in a cold bath and to place ice on his testicles. Robert Lee Johnson began to respond. Individuals inside the room in the La Quinta where Robert Lee Johnson was in the bathtub began to call 911, but were

Defendant's Initials _____          13

instructed to hang up by another individual. Early in the morning hours of April 20, 2010, witnesses saw blood trickling out of Robert Lee Johnson's nose as he laid in the cold bath water inside the La Quinta motel room. Paramedics were called. Robert Lee Johnson died. Legg and others associated with him obtained the pill bottle from Duval Wellness containing Robert Lee Johnson's prescription for the 30 mg and 15 mg oxycodone pills. There were pills missing from the 30 mg oxycodone bottle. The Duval County Medical Examiner and autopsy report reflects that Robert Lee Johnson had a significant amount of oxycodone in his blood. The determined cause of death was an accidental oxycodone overdose. On April 20, even after Johnson died, Legg and his associates took the clients/patients to Duval Wellness so that they could obtain their oxycodone prescriptions pursuant to the referenced agreement.

During the ensuing months, through about July 28, 2010, Legg and his associates continued to bring large groups of people, sometimes in a bus that Legg purchased from a part owner of Duval Wellness, to the Jacksonville pain clinics to obtain oxycodone. Legg and his associates redistributed these pills in the Columbus, Ohio area for substantial profits.

When clients/patients attempting to see the physicians at Jacksonville Pain and Duval Wellness could not be seen due to too many patients arriving at those clinics on a particular day (which regularly exceeded 100 people), staff at Jacksonville Pain and Duval Wellness referred these patients to First Coast Pain. While Jacksonville Pain, and its successor clinic Duval Wellness, and First Coast Pain were separate clinics, there was common ownership, primarily involving the individual referenced as "the

Defendant's Initials _[signature]_            14

owner". These clinics referred clients/patients back and forth. Both clinics also referred the clients/patients to the individual who owned the mobile MRI unit.

On June 23, 2010, six undercover agents from the Drug Enforcement Administration (UCs) traveled with a confidential source (CS-1) to Duval Wellness so that CS-1 could facilitate these UCs seeing physicians at Duval Wellness in a "VIP" (very important patient) capacity. The UCs met with security guards and told a security guard that they were "with [CS1]." The UCs were provided wristbands that would allow them to see physicians at Duval Wellness that day. CS-1 arranged with the Duval Wellness staff for the UCs to be seen by a specific doctor who was working that day at Duval Wellness. During the ensuing hours, all six DEA UCs saw a specific physician at Duval Wellness. The six UCs prepared patient information forms using undercover names and presented Florida identification with those names. In sum, the UCs put very little information in their patient information charts and noted that their pain was significant (at times the worst pain imaginable) when not taking oxycodone and that they had little to no pain when taking oxycodone. The UCs also indicated that they held strenuous "blue collar" type jobs which required manual labor.

In sum, when the UCs saw the Duval Wellness physician, the physician did a minimal physical examination, did not independently verify medical history, did not discuss alternative treatments or referrals to a specialist and only cursorily reviewed the MRIs that the UCs provided (which were actually their own MRIs). These MRIs show little or nothing wrong with the UCs lower backs. All of the UCs submitted a urine specimen to be tested for the presence of opiates and benzodiazepines (xanax) and oxycodone. All of the UCs tested negative for the presence of those drugs in their

Defendant's Initials _____                    15

system, which indicates that the UCs were not taking any opiates or benzodiazepines at that time. None of the UCs presented any symptoms of withdrawal from those drugs to the doctor who examined them. Despite this and that the examining physician commented to some of the UCs that they appeared "strong" during the cursory physical examination, the physician prescribed significant levels of oxycodone and xanax to the UCs. These prescriptions ranged from 180 30 mg oxycodone pills, 120 15 mg oxycodone pills and 60 2 mg xanax tablets to 120 30 mg oxycodone pills and 90 15 mg oxycodone pills. When the physician prescribed one UC 120 30 mg oxycodone pills, the UC simply asked for more medication and the physician immediately agreed to giving the UC 90 15 mg oxycodone pills. The entire examination that the physician performed on that particular UC lasted for 5 minutes and 22 seconds.

On July 26, 2010, two Jacksonville Sheriff's Office (JSO) undercover officers went to First Coast Pain and saw a specific doctor at that clinic. Similar to the DEA UCs, the JSO UCs used undercover names and identification. The identification cards they presented were from the state of Kentucky. While the physician spent about twenty minutes apiece with the UCs, no real physical examination occurred. One of the JSO UCs made repeated inconsistent statements about whether he had previously taken oxycodone. During times when the JSO UC stated that he had previously taken oxycodone, the JSO UC then made inconsistent statements concerning whether these oxycodone tablets were prescribed to him, or whether he had intermittently purchased them "off the street." Both JSO UCs provided urine specimens, which tested negative for the presence of any controlled substance (including oxycodone, opiates and benzodiazepines). Notwithstanding the statements of the UC, the physician never

Defendant's Initials _____    16

questioned the UC concerning the inconsistencies and never took any steps to independently verify whether a physician had ever prescribed oxycodone to the JSO UC. The physician did not discuss that the JSO UCs tested negative for the presence of opiates and benzodiazepines in their urine and that the results of the drug tests were inconsistent with the information on their patient charts and statements about having previously taken oxycodone. The First Coast physician prescribed one JSO UC 180 30 mg oxycodone tablets (6 per day), 60 15 mg oxycodone tablets (approximately 2 per day as needed for "breakthrough" pain between dosages of the 30 mg oxycodone) and 60 2 mg xanax tablets (a ½ to 1 tablet 3 times per day); the same physician prescribed the other JSO UC 150 30 mg oxycodone tablets (5 per day), 90 15 mg oxycodone tablets (approximately 3 per day as needed for "breakthrough" pain between dosages of the 30 mg oxycodone tablets) and 30 2 mg xanax tablets (a quarter to ½ of a 2 mg tablet 3 times per day).

    An individual anticipated to be qualified as an expert witness in internal medicine with a sub-specialty in pain management would testify, after reviewing all of the undercover charts and recordings and over a total of 100 patient files specifically and randomly selected for each of the seven physicians at Jacksonville Pain, Duval Wellness and First Coast Pain, that, with respect to the undercover officers alone, if those officers had taken the oxycodone and xanax prescriptions as prescribed, those officers easily could have died. The expert will opine that these and other prescriptions written to various patients were issued outside the usual course of medical practice and not for any legitimate medical purpose.

Defendant's Initials _____    17

On July 29, 2010, the DEA, FBI and JSO executed in excess of forty (40) search and seizure warrants, including search warrants at the physical locations of Duval Wellness and First Coast Pain. All patient records inside Duval Wellness and First Coast Pain were seized. The officers seized $20,726.00 in cash from First Coast Pain. In addition, numerous bank accounts from SunTrust, Bank of America and Citizens Bank were seized. These accounts were in the name of various businesses, all of which were a front for cash deposits made from the business of the three Jacksonville pain clinics. The bank accounts were those of the owner, co-owners and physicians. The aggregate amount of money seized in the numerous bank accounts was $3,443,968.68. There were six (6) total accounts seized belonging to the owner. The aggregate amount of money seized in those six accounts was $2,248,153.89. The owner, Jenna Crawley and others worked together at various times to make daily deposits of significant sums of money into these various bank accounts, sums of money which were the profits of the illicit activity at the Jacksonville pain clinics.

Jenna Crawley also opened various bank accounts in business names such as Nico Consulting, LLC and Heavy Investments, LLC. In 2010, Crawley deposited significant amounts of cash and checks from Jacksonville Pain and Duval Wellness into the Nico Consulting, LLC and Heavy Investment, LLC bank accounts. The money deposited into the two accounts bank accounts for Heavy Investments, LLC and the single account for Nico Consulting, LLC represented Crawley's cut of the ownership interest in the Jacksonville pain clinics. The following is a recitation of deposits into Crawley's Nico Consulting, LLC Suntrust bank account with account number XXXXXXXX5427 from money derived from her illicit involvement in the Jacksonville

Defendant's Initials _____                              18

pain clinics: (1) cash in the amount of $2,355.00 on 2/10/10; (2) cash in the amount of $1,360.00 on 2/16/10; (3) cash in the amount of $20,000.00 on 2/23/10; (4) a check from Jacksonville Pain in the amount of $50,000.00 on 3/15/2010; (5) cash in the amount of $3,000.00 on 3/29/10; (6) cash in the amount of $50,000.00 on 4/28/10; (7) a check from Duval Wellness Center in the amount of $75,000.00 on 5/28/10; and (8) a check from Duval Wellness in the amount of $100,000.00 on 6/11/10.

The following is a recitation of deposits into Crawley's Heavy Investments, LLC Citizens Bank account with account number XXXXXX3214 from money derived from her illicit involvement in the Jacksonville pain clinics: (1) a check from Jacksonville Pain in the amount of $60,000.00 on 4/21/10; and (2) a check from Duval Wellness in the amount of $110,000.00 on 5/17/10.

The following is a recitation of deposits into Crawley's Heavy Investments, LLC Citizens Bank account with account number XXXXXX3222 from money derived from her illicit involvement in the Jacksonville pain clinics: a check from Jacksonville Pain in the amount of $10,000.00 on 4/21/10.

On July 29, 2010, law enforcement officers with DEA and FBI executed numerous search and seizure warrants, including seizure warrants on the two Heavy Investment, LLC accounts and the one Nico Consulting, LLC account. Both Heavy Investment, LLC accounts were held with Citizens Bank. $147,640.32 was seized from Citizens Banks account number XXXXXX3214. $10,000.00 was seized from Citizens Bank account number XXXXXX3222. $202,231.91 was seized from the Nico Consulting, LLC SunTrust bank account with account number XXXXXXXX5427. The aggregate amount of money seized from Jenna Crawley (in 3 separate bank accounts -

Defendant's Initials _____    19

two for Heavy Investments and one for Nico Consulting) was $359,872.23. All sums were profits made from the illicit pain clinic business and were deposited in the referenced accounts.

The aggregate amount of money seized from a bank account of another co-owner was $57,903.41. Other large sums of money were likewise seized from the bank accounts of various physicians who worked at Jacksonville Pain, Duval Wellness and First Coast Pain. Various vehicles, including a 2007 Mercedes-Benz, a 2010 Land Rover SUV and a 2010 GMC Denali, were seized.

In calendar year 2010, the seven physicians at Jacksonville Pain, Duval Wellness and First Coast Pain all placed in the top 100 practitioners in the United States for units of oxycodone ordered from their particular DEA number. The seven physicians placed third, fourth, eighth, seventeenth, forty-fifth, fifty-fourth and ninety-fourth on that list. The total units of oxycodone ordered from these physicians' respective DEA numbers in calendar year 2010 are as follows: 790,880, 670,680, 545,600, 468,160, 295,140, 272,880, 172,834.

Defendant's Initials _[signature]_          20